Darryl MATTIS, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CM–831.

District of Columbia Court of Appeals.

Submitted April 22, 2010.
Decided May 20, 2010.

Robert H. Hollander, appointed by the court, for appellant.

Jeffrey A. Taylor, United States Attorney at the time, and Channing D. Phillips, Roy W. McLeese III, Chrisellen R. Kolb, Erin Walsh, and L. Jackson Thomas II, Assistant United States Attorneys, for appellee.

Before WASHINGTON, Chief Judge, and FISHER and BLACKBURNE–RIGSBY, Associate Judges.

FISHER, Associate Judge:

Appellant Darryl Mattis claims that his conviction for assaulting, resisting, or interfering with a police officer ("APO"), in violation of D.C.Code § 22–405(b) (2009 Supp.), must be reversed because an off-duty officer is not protected by the statute when engaged in outside employment. We disagree and affirm.

## I. Factual and Procedural Background

On the evening of March 27, 2009, Officer Lloyd Murphy, a member of the District of Columbia Metropolitan Police Department ("MPD"), was working part-time as a "uniformed officer" at a TGIFridays in the District of Columbia. Someone told Officer Murphy that "there was a guy and a lady arguing at the bar." As he approached the bar, Officer Murphy could "hear [appellant's] loud voice." Mr. Mattis was "cursing out the young lady" while "standing directly over top of her back . . . as she was sitting at the bar."[1]

Officer Murphy tapped appellant on the shoulder and asked him to lower his voice and stop cursing. In response, appellant asked Officer Murphy, "who the fuck [are you]?" and lunged forward, pushing the officer in the chest with both hands, so that he stumbled backwards a few feet. Officer Murphy then asked if he could see Mr. Mattis outside. Appellant refused, put his fists up, and told the officer to "mind [his] fucking business." At that point, Officer Murphy attempted to handcuff Mr. Mattis, but appellant slipped, grabbed the officer on the way down, and they both fell to the floor. They "scuffle[d]" and eventually Officer Herbert Newman, who was also working at TGIFridays, helped handcuff appellant.

Appellant testified on his own behalf and explained that, while waiting for his check, he started talking with the patron beside him. He jokingly asked her whether she had stolen his money—a comment that he sometimes uses as "an icebreaker. . . ." He claimed that she misconstrued his remark and began "cussing [him] out," and the two started arguing. Shortly thereafter, "an officer [in an unadorned blue rain jacket or overcoat] came out of nowhere. . . ." According to appellant, the man "didn't appear to be an officer. . . . He didn't announce himself as an officer. He didn't act as an officer. I just [peripherally saw] somebody approaching me." Mr. Mattis denied pushing anyone and denied being handcuffed while in the restaurant. In fact, Mr. Mattis suggested that he did not realize Officer Murphy was a police officer until he "was sitting in jail trying to figure out . . . why [he] was

---

1. Mr. Mattis had consumed at least one beer and two Long Island iced teas while at the restaurant and, when Officer Murphy approached, he observed that Mr. Mattis was "truly intoxicated."

there" and received "some type of report [that] . . . said assault on a police officer."

Judge Christian found the testimony of Officer Murphy and the female patron "credible beyond a reasonable doubt." By contrast, appellant was "much less credible." The court found that Officer Murphy "approached the defendant in a reasonable manner" but "the defendant pushed him with such force that he stepped back, he was pushed back away. . . ." Although appellant testified he did not recognize that Murphy was an officer, the trial court rejected that assertion as a matter of fact.[2]

## II. Legal Analysis

■ Appellant argues that because Officer Murphy "was in an off-duty status, [ ] he was not a party protected by the APO statute." We are not persuaded and hold that the APO statute protected Officer Murphy even though he was off duty and working for a private employer at the time of the assault.

■ Under the District's APO statute, "[w]hoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties," is guilty of a misdemeanor. D.C.Code § 22–405(b) (2009 Supp.).[3] No-

tably, the statutory language does not focus on whether an officer is on or off duty but, rather, on whether he is engaged in the performance of official duties. *Id.*

There is no question that when Mr. Mattis pushed Officer Murphy he assaulted him. *See Dunn v. United States,* 976 A.2d 217, 220–21 (D.C.2009) (affirming conviction for simple assault where defendant pushed his victim); *Ray v. United States,* 575 A.2d 1196, 1199 (D.C.1990) (discussing offense of assault and affirming assault conviction of defendant who spat in the face of officer who arrested her). Moreover, Mr. Mattis acted "without justifiable and excusable cause" when he shoved Officer Murphy.[4] In addition, at the time of the assault, Officer Murphy was "a law enforcement officer." *See* 6A DCMR § 304.16 (2009) ("Although off-duty and engaged in outside employment, members [of the police force] are considered law enforcement agents. . . ."). The remaining inquiry is whether Officer Murphy was engaged in "the performance of his [ ] official duties."

■ The APO statute does not define "official duties." *See* D.C.Code § 22–405 (2009 Supp.). This court has recognized, however, that MPD members are "held to be always on duty" when they are in the District of Columbia, and "the fact that they may be technically off duty shall not be held as relieving them from the respon-

---

2. Officer Murphy wore a full police uniform, which included traditional police garb, badge, name plate, insignia, and a blue MPD jacket with police department patches on it.

3. "A person who violates subsection (b)" of the APO statute and either "causes significant bodily injury" or "commits a violent act that creates a grave risk of causing significant bodily injury" to an officer is guilty of a felony. D.C.Code § 22–405(c) (2009 Supp.).

4. Judge Christian specifically found "beyond a reasonable doubt that the officer did not use

excessive force." *See Speed v. United States,* 562 A.2d 124, 128 (D.C.1989) ("[T]he use of force against an officer who is attempting to detain a citizen for any legitimate purpose associated with official police duties must be limited only to defense against excessive force."); *see also* D.C.Code § 22–405(d) (2009 Supp.) ("It is neither justifiable nor excusable cause for a person to use force to resist an arrest when such an arrest is made by an individual he or she has reason to believe is a law enforcement officer, whether or not such arrest is lawful.").

sibility of taking proper police action in any matter coming to their attention requiring that action." *Smallwood v. District of Columbia Metropolitan Police Dep't,* 956 A.2d 705, 708 (D.C.2008) (quoting 6A DCMR § 200.4 (2008)); *see also Bauldock v. Davco Food, Inc.,* 622 A.2d 28, 34 (D.C.1993) ("the officer was required by statute and regulation to [make the arrest] as a Metropolitan Police officer even while off duty"). For instance, police officers "are required to take police action when crimes are committed in their presence." *District of Columbia v. Coleman,* 667 A.2d 811, 818 n. 11 (D.C.1995); *see also Lande v. Menage Ltd. Partnership,* 702 A.2d 1259, 1261 (D.C.1997) ("The failure of an officer to exercise arrest powers when a crime is committed in the officer's presence may subject him to criminal penalties.") (citing D.C.Code § 4–142 (1981), now codified as D.C.Code § 5–115.03 (2008 repl. vol.)).

The same holds true for a member of the MPD engaged in "police-related outside employment . . . when the member's police powers are in effect. . . ." 6A DCMR § 303.5 (2009). The officer must continue to comply "with all applicable provisions of the D.C.Code and . . . [Title 6A of the Code of Municipal Regulations] pertaining to the performance of duties, the law of arrest, and the use of firearms and other weapons." *Id.* Consequently, irrespective of an officer's duty status, "when in the District of Columbia, [he is] required to respond to felonies in progress

and crimes against persons." 6A DCMR § 303.11(b) (2009).[5]

It is not necessary to decide whether a crime had already been committed when Officer Murphy approached to investigate the disturbance. He properly was determining whether a crime was being committed and attempting to defuse the situation.[6] Accordingly, we agree with the trial court that, when Officer Murphy intervened in the argument and made requests of Mr. Mattis, he was acting "as an officer trying to resolve a situation. . . ." *See Bauldock,* 622 A.2d at 33–34 (quoting *Wells v. Washington Market Co.,* 19 D.C. (8 Mackey) 385, 398 (1890) ("[T]he officer perhaps had more inclination to show superserviceable zeal in behalf of the interests of the [market where he worked part time to preserve order]. Nevertheless, his appointment under these circumstances did not change, in the slightest degree, his duties and his responsibility as an officer of the Metropolitan Police force. . . .")). So, in spite of his off-duty status, when Officer Murphy intervened, he was engaged in the performance of official duties. *See Lande,* 702 A.2d at 1261 (plain-clothes, off-duty officers, who stopped nightclub patron from leaving premises with open beer bottle, which would have violated ordinance, were acting as officers, even though one worked at the club when off duty).[7]

"[A] principal rationale of the APO statute . . . is to 'de-escalate the po-

---

**5.** The general rule that officers are held to be always on duty does not apply when the officer is outside his or her jurisdiction, where he or she lacks police powers. *See Rife v. District of Columbia Police & Firefighters' Retirement & Relief Bd.,* 940 A.2d 964, 965 (D.C. 2007).

**6.** *See Speed,* 562 A.2d at 128 ("There now exists an entire spectrum of encounters between police and citizens, ranging from investigatory questioning, to stops and detainments

permissible under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to temporary custody, and finally to arrest. Forcible resistance to any one of this myriad of contacts presents no less danger than forcible resistance to arrests.").

**7.** Mr. Mattis asserts that the rule of lenity requires us to read the statute narrowly, as applying only to officers who are technically on duty. Yet, we have explained that the rule of lenity "can tip the balance in favor of

tential for violence which exists whenever a police officer encounters an individual in the line of duty.' ... This concern is not limited to the officer's safety but extends to all parties involved, including the prospective arrestee." *Dolson v. United States*, 948 A.2d 1193, 1202 (D.C.2008) (quoting *In re C.L.D.*, 739 A.2d 353, 355 (D.C.1999)). By statute and regulation, we require officers to take action when matters needing police attention occur in their presence, regardless of their duty status. It therefore is both logical and fair to provide off-duty officers in the District with the same protection an "on duty" officer receives under the APO statute, provided they are engaged in the performance of official duties.[8]

## III. Conclusion

We reject appellant's claim that Officer Murphy's encounter with him was not part of the officer's "official duties." The judgment of the Superior Court is hereby

*Affirmed.*

criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose and legislative history leave its meaning genuinely in doubt." *Lemon v. United States*, 564 A.2d 1368, 1381 (D.C.1989) (internal quotation marks and citation omitted). No such genuine doubt exists in this case.

8. Finally, appellant claims that, because he was "simply exercising his free speech when he was yelling at [the female patron]," Officer Murphy "could not have been performing any official duties when he interfered with [him]." *See* D.C.Code § 5–333.04 (2008 repl. vol.) ("The MPD shall conduct all investigations and preliminary inquiries involving First Amendment activities for a legitimate law enforcement objective and, in so doing, shall safeguard the constitutional rights and liberties of all persons."). We will assume, with-

out deciding, that appellant had a First Amendment right to be loud and obnoxious in a bar. Even so, he had no right to use violence against a police officer. *See Dolson*, 948 A.2d at 1201 nn. 8–9, 1202 (citing cases for the proposition that "citizens must endure even an unlawful arrest without resorting to force because the indignity and inconvenience of an improper arrest do not outweigh the potential for injuries when a suspect [ ] make[s][his] own snap judgments about the legality" of an officer's demands) (internal quotation marks and citation omitted). If an officer acts illegally (and there is no indication that Officer Murphy did so), a citizen "has recourse through legal means, ... and need not resort to physical violence in order to protect his ... rights." *Id.* at 1202.